IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LISA MICHELLE TYLER,<br><br>                    Plaintiff,<br><br>     v.<br><br>CAROLYN W. COLVIN,<br>Acting Commissioner of SSA,<br><br>                    Defendant. | CIVIL ACTION<br>NO. 13-4459 |

**MEMORANDUM**

**SCHMEHL, J.  /s/ JLS**                                                                                  August 8, 2016

      Plaintiff Lisa Tyler filed a complaint seeking review of the Social Security Administration's decision denying her disability benefits. Magistrate Judge Richard A. Lloret prepared a Report and Recommendation calling for the Court to affirm the decision, after which Plaintiff filed objections. Having reviewed the record, the magistrate's recommendation, and the parties' arguments including the objection briefs, the Court finds that the Administrative Law Judge's opinion denying benefits did not sufficiently set forth the ALJ's reasoning on several aspects of the case. For that reason, although the ALJ's ultimate conclusion may or may not be reasonable and valid, the Court must respectfully decline to adopt the report and recommendation and instead order remand.

<u>Factual and Procedural Background</u>

      Although the Court ultimately disagrees with the magistrate's recommendation, his report ably lays out the facts and history of the case:

## PROCEDURAL HISTORY

The ALJ denied Tyler's claim for SSI on December 7, 2011. R. 30. Applying the five-step sequential analysis,[1] the ALJ found Tyler had not engaged in substantial gainful activity since October 18, 2004. R. 22. She was found to have suffered from the following severe impairments: mood disorder and polysubstance abuse. R. 22. None of these impairments or combination of impairments equaled the severity of one of the listed impairments. R. 23; *see also* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526.

In addition, the ALJ found that

> the claimant has the residual functional capacity ["RFC"] to perform a full range of work at all exertional levels. However, the claimant is subject to the following nonexertional limitations: Claimant's moderate limitations in concentration and attendance restrict her to simple and routine (unskilled) repetitive tasks, and which tasks involve infrequent changes in the work setting, and no more than occasional interaction with co-workers, supervisors, or the public.

R. 27. Based on this RFC finding and Tyler's age, education, and work experience, the ALJ found that she could perform various jobs in the national economy, including as a cleaner, automobile detailer, and assembly worker. R. 30. In concluding her opinion, the ALJ found that the claimant was not disabled. *Id.*

The Appeals Council denied Tyler's request for review on June 3, 2013. R. 1-5. She brings this civil action for judicial review through 42 U.S.C. § 405(g).

## FACTUAL HISTORY

At the time of the hearing, Tyler was 31 years old and married with two children. R. 34. She had past relevant work experience as a toll collector and at Macy's as a sales associate. R. 22. Tyler has an associate's degree in marketing. R. 35. Though she testified that she has no physical restrictions, Tyler claims to suffer from severe depression that makes it

---

[1] For this analysis, the ALJ considers whether a claimant: (1) is engaged in substantial gainful employment; (2) has one or more severe impairments, which significantly limit his ability to perform basic work; (3) has impairments that meet or equal the criteria associated with impairments in the Social Security Regulations so as to mandate a disability finding; (4) has a Residual Functional Capacity ("RFC") to perform work with his limitations and can return to his previous work with that RFC; and (5) can perform any other work existing in the national economy. *See* 20 C.F.R. § 416.920(a)(4)(i)-(v).

hard for her to work. R. 36. She also testified to mood swings, in that she "could be fine, and then I get really angry." *Id.* She was offered a job at a Head Start Daycare, but turned down the position because she was "not feeling good enough about [herself] or [her] self-esteem. . . ." R. 40.

She also testified to a history of drug problems. Tyler admitted under questioning from the ALJ that she had used cocaine in September of 2010 and the longest she had been sober was a year period from 2006 to 2007. R. 41. This discussion led to a review of her mental issues by the claimant's attorney.

> Q: You've mentioned depression a few times. Have you been diagnosed with any other mental conditions?
> A: Depression, anxiety, post-traumatic stress syndrome, I got a list, mood disorder. Like mood disorder, anxiety, depression, OCD, post-traumatic stress and mood – yeah.
> Q: And you listed that you're being medicated for these conditions, right?
> A: Correct.
> Q: Do you have any side effect from those medications?
> A: I get tired. Sometimes I get headaches, and I forget a lot.
> Q: So you think that your issues with memory are as a result of the medications you're taking?
> A: Yeah.

R. 42. Further testimony from Tyler revealed that she suffered from suicidal thoughts, mood issues, anger problems, and a series of clashes with supervisors. R. 43-44.

Dr. Carolyn E. Rutherford testified at the hearing as the vocational expert ("VE"). Dr. Rutherford identified four categories of work Tyler held that would be considered substantial gainful activity. R. 44-45. These included positions as a cleaner (DOT: 323.687-014), toll collector (DOT: 211.462-038), sales clerk (DOT: 290.477-014), and nursery school attendant (DOT: 359.677-018). R. 45. The ALJ then provided the VE with a hypothetical individual with no exertional limitations, but secondary to moderate limitations in concentration and attention along with limits to routine, repetitive tasks. R. 45-46. Under those conditions, the VE identified positions as a cleaner (DOT sample: 381.687-018), automobile detailer (DOT sample: 915.687-034), and a range of assembly work positions (DOT sample: 712.687-050). Under questioning from the claimant's attorney, Dr. Rutherford admitted that there would be some contact with supervisors in any of these positions, but limited contact with the public. R. 47.

The ALJ also heard additional testimony from Chris Tyler, the claimant's husband. He spoke at length about his wife's mental condition,

3

including her inability to follow through with tasks, staying in bed for long stretches, and not participating in household chores. R. 48. Her mental degradation appeared to be getting progressively worse and was triggered after the birth of her first son. R. 49. Chris Tyler believed that his wife would be unable to sustain full-time employment because of long stretches of time where she cannot function properly due to mental issues. *Id.* Her medical history, as evidenced by the records before the ALJ, is as follows.

## A. <u>Medical History</u>

This portion of the Report and Recommendation discusses the various ailments allegedly plaguing Tyler that led her to petition this court for review of the ALJ decision. The majority of the analysis from the Commissioner and the claimant centers on the opinions of two doctors, Ronald Karpf, Ph.D. and Rosalinda V. Gabriel, M.D. Their findings are summarized below.

### 1. The Opinion of Dr. Ronald Karpf, Ph.D

Dr. Karpf provided a one-time consultation of the claimant in December of 2010, providing a complete history and mental status examination. R. 301. The psychologist first outlined Tyler's history of mental illness. The claimant spoke at some length about her depression since she was 14 years-old along with apparent post-traumatic stress disorder, which Dr. Karpf did not believe she suffered from. R. 302. He also discussed her history of drug use, noting that she "has abused opiate drugs, cocaine, LSD, and Xanax. She has been off the cocaine for a year and a half and was off the opiates only for October, since October of 2010." *Id.* Tyler attended drug and alcohol rehabilitation once in 2004 and again in July of 2010. *Id.* At the time of the examination, the claimant was in an out-patient treatment program and taking a regimen of Saboxone, Clonidine, and Lexapro. *Id.*

In reviewing Tyler's mental status, the doctor wrote that she had poor posture, kept her head down for much of the interview, and avoided eye contact. R. 303. Her hygiene and grooming were good and she suffered from no walking issues. *Id.* Dr. Karpf noted that Tyler was cooperative throughout the examination while exhibiting normal volume and rate in conversation. R. 304. She demonstrated no hallucinations, illusions, depersonalization, or derealization. *Id.* The doctor observed a mild impairment related to immediate retention evidenced by the inability of the claimant to remember certain number patterns. R. 305. Tyler's insight was deemed "good in the sense that she knows she has a mental illness and needs treatment." R. 306.

Dr. Karpf also provided an analysis of how these various

4

impairments impacted her functioning. In activities of daily living, Tyler cleans, shops, and cooks on occasion. *Id.* While she does have problems communicating clearly, she participates in activities through her involvement in Narcotics Anonymous. *Id.* There are issues with the claimant sticking to tasks and sustaining routines and she requires "frequent rest periods to perform at a consistent pace." R. 306-07. In summarizing his report, Dr. Karpf noted that Tyler suffered from "severe" emotional problems and needed to ensure that she regularly received psychotherapy. R. 307.

### 2. Opinion of Dr. Rosalinda Gabriel, M.D.

Dr. Gabriel provided a series of opinions and medical observations over a number of months at the Penndel Mental Health Center.[2] These treatments included medication management programs, individual therapy, and group therapy. R. 24. In a March 2011 meeting, Dr. Gabriel wrote that Tyler "has had recurrent depression with mood swings, poor sleep, poor concentration in the past years. She also admitted to have abused Oxycontin." R. 367. This report also charts a long history of drug abuse, including the use of marijuana, LSD, and alcohol at 14, ecstasy at 16, and cocaine and painkillers at age 18. *Id.* Her addiction to pain pills continued until 2010. *Id.* The doctor assigned her a GAF score of 48.[3] In May, Tyler reported that she still felt "very depressed with no energy, no interest towards her daily activities. R. 365. A similar note was prepared in June of 2011 discussing Tyler's issues finding permanent housing and the fact that she is "very depressed." R. 364.

By July, Dr. Gabriel noted that Tyler had turned things around. She reported "feeling better[,] [s]he is not depressed. She is less anxious. Her mood is stable." R. 363. In September of that year, Tyler admitted to Dr. Gabriel that she "has the urge to take cocaine. . . ." R. 362. Tyler also requested a prescription for Adderall "which she claims she has borrowed from her friend in the past and it made her improve her concentration." *Id.* In a summary of Tyler's attendance at these sessions, she is listed as having attended 30 out of a total of 50 appointments. R. 353.

---

[2] According to the record, Tyler began attending treatment at this facility in October 2010 and extends through November of 2011. *See* R. 24-25 (detailing different treatment dates and times).

[3] The Global Assessment of Functioning ("GAF") score is a measurement of a person's overall psychological, social, and occupational functioning, and is used to assess mental health. Diagnostic and Statistical Manual of Mental Disorders, 4th ed. Text Revision (2000) ("DSM IV-TR"). A GAF score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)." *Id.* The GAF scale was dropped from the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition (2013). *Id.*

Discussion

The magistrate's report also explains some of the basic legal framework:

> A claimant is disabled if she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905; *see also Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 503 (3d Cir. 2009). In reviewing an ALJ's disability determination, I must accept all the ALJ's fact findings if supported by substantial evidence or "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 390 (1971) (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also* 42 U.S.C. § 405(g). I may not weigh the evidence or substitute my own conclusions for those of the ALJ. *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011). However, with respect to the ALJ's legal conclusions and application of legal principles, I must conduct a "plenary review" to make that determination. *Payton v. Barnhart*, 416 F. Supp. 2d 385, 387 (E.D. Pa. 2006).

**A. Standards for the Evaluation of Medical Evidence**

A treating source's opinion is entitled to controlling weight when supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with other substantial evidence in the record.[4] *See* 20 C.F.R. § 416.927(c)(2); SSR 96-2p, 1996 WL 374188 (July 2, 1996). An opinion may be rejected "on the basis of contradictory medical evidence." *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999). So too may an opinion be rejected if there is insufficient clinical data. *Newhouse v. Heckler*, 753 F.2d 283, 286 (3d Cir. 1985). The opinion may be accorded "more or less weight depending upon the extent to which supporting explanations are provided." *Plummer*, 186 F.3d at 429 (*citing Newhouse*, 753 F.2d at 286).

Where a treating source's opinion is not given controlling weight, the ALJ must determine what weight to give the relevant medical sources by considering factors such as the length of the treatment relationship and frequency of visits, nature and extent of the treatment relationship,

---

[4] A treating source is a "physician, psychologist, or other acceptable medical source" who provides a patient with "medical treatment or evaluation," and has an "ongoing treatment relationship with the patient." 20 C.F.R. § 404.1502. A medical source may be considered a treating source where the claimant sees the source "with a frequency consistent with accepted medical practice for the type of treatment . . . required for [the claimant's] condition(s)." *Id.*

whether the medical source supports the opinion with medical evidence, whether the opinion is consistent with the medical record, and the medical source's specialization. 20 C.F.R. § 404.1527(c). In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports" and may not reject a treating physician's opinion "due to his or her own credibility judgments, speculation or lay opinion." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000).

Opinions from non-treating sources who have examined a claimant also garner significant weight.[5] 20 C.F.R. § 416.927(d)(1); *see Chandler*, 667 F.3d at 361. While they do not receive as much consideration as a treating source's opinions, they warrant more weight than the opinion of non-examining medical sources. 20 C.F.R. § 416. 927(d)(1); *see also Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 257 (3d Cir. 2008). Testimony from a non-examining source also must be considered by the ALJ, but is not entitled to deference.[6] 20 C.F.R. § 416.927(f); SSR 96-6p, 1996 WL 374180 at *2. It is error to "credit the testimony of a consulting physician who has not examined the claimant when such testimony conflicts with testimony of the claimant's treating physician." *Franklin v. Barnhart*, No. 05-2215, 2006 WL 1686692, at *11 (E.D. Pa. June 13, 2006) (quoting *Dorf v. Bowen*, 794 F.2d 896, 901 (3d Cir. 1986)).

As noted above, pursuant to 20 C.F.R. 416.927(c)(2), when deciding that a treating source's opinion is not entitled to controlling weight, the ALJ must evaluate the opinion by considering certain factors such as: the length of the treatment relationship, the frequency of visits, the nature and extent of the treatment relationship, whether the source has supported his or her opinion with medical evidence, whether the opinion is consistent with the medical record and the medical source's specialization. 20 C.F.R. 416.927(c)(2); *see also* SSR 96-2p, 1996 SSR LEXIS 9, 1996 WL 374188, at *4.

The magistrate first addresses Plaintiff's argument regarding the parties' respective burdens under the five-step disability analysis.[7] Plaintiff argued that because

---

[5] Non-treating sources are usually doctors who have examined the claimant, but not in the context of an ongoing treatment relationship. 20 C.F.R. § 416.902. A source is non-treating if a claimant visits a doctor solely to obtain a report in support of his or her claim. *Id.*

[6] A non-examining source is an acceptable medical source who has not examined the claimant, but who provides a medical opinion of the case. 20 C.F.R. § 416.902.

[7] In step one, the ALJ, acting for the Commisioner, determines whether the claimant is engaging in substantial gainful activity, and if so, denies the claim. *See* 20 C.F.R. §§ 404.1520(b) and 416.920(b); *Bowen v. Yuckert*, 482 U.S. 137, 140, (1987). In step two, the ALJ decides if there is a severe impairment. *See* 20 C.F.R. §§ 404.1520(c) and 416.920(c). If there is a severe impairment, the ALJ moves to step three and determines if the impairment meets the criteria of officially listed impairments. *See* 20 C.F.R.

the ALJ found she could not perform past relevant work (step four), Plaintiff had made out a prima facie claim that Defendant had to rebut with substantial evidence of viable alternative work (step five). But the magistrate explains that Defendant has only a burden of *production* at step five and a claimant must still prove her disability. Plaintiff has not objected to this part of the report and recommendation, and the Court approves its reasoning.

The contested issues begin with the next section of the magistrate's report, which deals with Plaintiff's argument that the ALJ did not adequately consider and credit Dr. Gabriel's low GAF score. The magistrate does note that "a more thorough analysis of Dr. Gabriel's GAF score would have been helpful," but concludes there was no error because 1) the underlying evidence and opinion is more crucial than a GAF number, and 2) there was some indication that the ALJ based her decision on Plaintiff's subsequent improvement. Plaintiff objects, reiterating her prior arguments, noting additional low GAF scores, and focusing on the ALJ's lack of explanation. The Court will consider just the one low score.[8]

The Court agrees with the initial idea that the underlying evidence, along with the ALJ's consideration thereof, is more important than bare GAF scores. *See Gilroy v. Astrue*, 351 F. App'x 714, 715 (3d Cir. 2009). However, the magistrate's conclusion that

---

§§ 404.1520(d) and 416.920(d). If the impairment is not equal to a listed impairment, the ALJ assesses the claimaint's residual functional capacity, and then in steps four and five determines whether that capacity allows the claimant to perform past relevant work or any other work. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e), 404.1520(f), 416.920(f), 404.1520(g), and 416.920(g).

[8] The magistrate notes that in addition to the GAF score of 48 that Plaintiff initially pointed out, Dr. Gabriel also gave a score of 45 on another occasion, which Plaintiff only raised in her reply brief. In fact, the Court's review of the record reveals a total of five GAF scores below 50: a 45 in November 2010 that may be from Dr. Gabriel, along with a 45 in January 2011, 48 in March 2011, 48 in April 2011, and 45 in May 2011 that are definitely from Dr. Gabriel. Defendant, in response to Plaintiff's objections, seems to suggest that Plaintiff has waived any argument based on low scores not raised in the initial brief. In any event, because even the one low score is enough to make the ALJ's explanation insufficient, as discussed below, there is no need to consider the others for purposes of this review.

the ALJ indeed gave sufficient consideration to the underlying evidence here is less convincing. In fact, one of the cases the magistrate cites, while noting that "failure to discuss GAF scores does not necessarily constitute error where the ALJ conducts a thorough analysis of the medical evidence," went on to conclude that the ALJ did not meet his obligation "to acknowledge the existence of low GAF scores and to explain why they were inconsistent with the evidence in the record." *Rivera v. Astrue*, 9 F. Supp. 3d 495, 506–07 (E.D. Pa. 2014). In general, the ALJ "must consider all evidence before him," and must also "give some indication of the evidence which he rejects and his reason(s) for discounting such evidence." *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000). A "failure to mention *and explain* this contradictory medical evidence [is] error." *Id.* (emphasis added). The ALJ must explain her reasoning so that the Court can review the decision. *See Cotter v. Harris*, 642 F.2d 700, 704-07 (3d Cir. 1981) ("[T]here is a particularly acute need for some explanation by the ALJ when s/he has rejected relevant evidence or when there is conflicting probative evidence in the record" such that "a reviewing court can determine whether the reasons for rejection were improper."). *Burnett* and *Cotter* repeatedly refer to the need to both "mention" *and* "explain" or "refute" evidence and reasoning. *See Burnett*, 220 F.3d at 119-22; *Cotter*, 642 F.2d at 706. The distinction is important because there is a difference between just descriptively recounting evidence and conveying analytical consideration of it. ALJ opinions are typically formulaic to some extent, at least partly by necessity because of the volume of cases and the technical nature of the review. But such systemization can and must be harnessed to make review clearer and more straightforward rather than less so.

Here, with respect to the ALJ's consideration of the low GAF score, there is very little to go on. The magistrate noted that the analysis was not very thorough, and in fact it does not clearly qualify as analysis at all; rather, it is merely a listing of the evidence. From page 23 of the record through all but the last two lines of page 25, the ALJ simply recites the evidence in the form of a descriptive factual history. From that point forward, in the actual analysis and findings, the ALJ never mentions the low GAF score, nor even Dr. Gabriel's evidence more generally. One reference to a lack of motivation and inability to get out of bed seems to come instead from Dr. Blumenthal, who treated Plaintiff from 2006 to 2010. The magistrate suggests the Court can infer that the ALJ was relying on Plaintiff's improvement in July 2011, after assignment of the low GAF score, but such an inference is not sufficiently supported by the text of the ALJ's opinion. Substantively, it was just one data point of apparent improvement, and by the next (and last) report in the record, in September 2011, Plaintiff was still very tired, with no energy and the urge to take cocaine, and insistent on taking Adderall, though she acceded to the doctor's disagreement on that medication. More importantly, there is almost no language in the opinion from which to infer that this improvement theory can be attributed to the ALJ rather than the magistrate.[9] The ALJ stated, in a simple chronology of the medical history, "by the July 13, 2011 medication visit, Dr. Gabriel stated that the claimant reported feeling better." R. 25. In the actually analytical portion of the opinion, the ALJ states, "[h]owever, as reflected in the more recent treatment notes of July 26, 2011, claimant was living in an apartment with her children and comfortable with the living

---

[9] Beyond demonstrating that the ALJ did not adequately state her reasons, accepting a theory that originates with the magistrate would run afoul of the familiar *Chenery* issues. See Sec. & Exch. Comm'n v. Chenery Corp., 332 U.S. 194, 196 (1947) ("a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency"); *Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 88 (1943).

situation. . . . By October 18, 2011 the claimant reported she secured a job . . . ." R. 26. This statement is in a discussion of the evidence from Dr. Karpf, with no reference to Dr. Gabriel. An assumption that the ALJ actually meant something like, "I find Dr. Gabriel's opinion and the associated GAF score unsupportive of a serious impairment because other evidence shows the claimant subsequently improved," is unwarranted; a sentence of that sort would have been easy to include and instead all we have are a few uses of the word "by" and a reference to "more recent treatment notes" with no analytical language and no connection to Dr. Gabriel or the low GAF score.[10] The ALJ goes on in the next section to list a number of things that might theoretically outweigh the low GAF score but never tells us that was her thinking. This failure to explain her reasoning such that the Court can review it without guessing at it is error.

Similar principles apply to the Court's consideration of Plaintiff's other arguments. Plaintiff next objects that the ALJ must have rejected Dr. Karpf's opinion (because if she had accepted it, she would have necessarily found a disability), and the reasons given for rejecting it are insufficient and wrong. The ALJ seems to have discounted Dr. Karpf's opinion because it is "based on a one-time assessment [and] is limited to the extent it is consistent with the evidence in its entirety, including the subsequent treatment records which reflect no more than a mild deficit in functioning given the GAF scores from her treating source"; the ALJ referenced the records from Dr.

---

[10] In considering what the ALJ did or did not have to say about Plaintiff's improvement over time, the Court also noted that the date by which Plaintiff had to establish disability is September 30, 2010. If a claimant becomes disabled after the relevant date, she is not entitled to benefits, and if she is disabled before the date but improves later, an ALJ may award and terminate benefits in one proceeding. *See Davis v. Califano*, 616 F.2d 348, 350 (8th Cir. 1979); *Dedis v. Chater*, 956 F. Supp. 45, 49 (D. Mass. 1997). Interestingly, most or all of the evidence that paints Plaintiff's impairments in the most severe light comes from after September 30, 2010, including Dr. Karpf's report and all the sub-50 GAF scores. So in addition to explaining whether or not improvement over time is a basis of her reasoning, on remand the ALJ should further address what the evidence says about Plaintiff's impairments during the necessary time window for eligibility.

11

Yi, who treated Plaintiff for her addiction. R. 28. The Court agrees with the magistrate that reliance on Dr. Yi's GAF scores is acceptable despite Dr. Yi's treatment being limited to addiction, because GAF scores are an inherently global measurement. However, as to the ALJ's reliance on Dr. Yi's high GAF scores without reference to Dr. Gabriel's low GAF score, the Court disagrees that Dr. Gabriel's score was sufficiently analyzed for the reasons stated above.

The issues with the ALJ's analysis of Dr. Karpf's opinion then get more complicated. Plaintiff argues that the ALJ was herself inconsistent by stating in one place that Plaintiff had no more than mild restrictions while elsewhere noting some moderate restrictions. The magistrate noted but did not directly answer this argument, but the Court does not find it to be a real problem with the ALJ's opinion; the words mild and moderate, especially when modifying different things—the very specific "deficit in functioning" in one case and "restrictions" or "difficulties" in others—are not hard and fast enough to create stark inconsistency.

But Plaintiff also objects that the magistrate has erred under *Chenery* by going on to discuss internal and external inconsistencies with Dr. Karpf's report and dismissing certain of Dr. Karpf's findings as mere "check-the-box" assessments due little weight. The inclination to deemphasize findings in which an expert merely checks off sections of a form rather than fully explaining his opinion is sound. *See Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993). However, in the Court's estimation, not only was the "check-the-box" rationale not employed by the ALJ here, creating a *Chenery* problem, now that attention has been drawn to this issue it appears that the ALJ failed to even address the check-box findings at all. A review of the ALJ's opinion reveals no mention of the

"marked" and "extreme" restrictions checked off by Dr. Karpf on the check-box form that follows his main report in the record. R. 309. In fact, the ALJ pretty clearly paraphrases Dr. Karpf's entire report otherwise, but stops short of recounting the check-box findings. If the ALJ referred to the check-box findings and then dismissed them in favor of the more detailed written findings or other record evidence, it would be easy to approve that reasoning. But because she did not even mention the marked and severe restrictions checked off, it is a step too far to construct justifications for her dismissal of those findings when there is no indication what she thought of those findings or whether she even considered them. An ALJ should not have to mention every single word of an extensive body of record evidence, but these findings, which directly state opinions about severe restrictions of job-related functional issues that differ from the ALJ's conclusion, should have been addressed.

Next, Plaintiff objects to the magistrate's recommendation regarding the ALJ's failure to make an explicit determination of Plaintiff's husband's credibility. As repeatedly noted above, the ALJ must provide some finding and explanation regarding all relevant evidence, the husband's testimony included. In a similar case, this Court found that an ALJ's reasoning was clear where a claimant's husband testified that the claimant was unable to do any household or other activities but the ALJ specifically explained that there was objective evidence on record of the claimant doing a wide variety of activities with some regularity. *See Webb v. Colvin*, No. CIV.A. 13-5528, 2015 WL 1780168, at *2 n.2 (E.D. Pa. Apr. 20, 2015). Here the ALJ has not nearly so strongly telegraphed her reasoning, and the contrast between the husband's claims and Plaintiff's apparent activities is much weaker. Given that remand is called for by other issues anyway, the

Court finds that the ALJ must also provide a more explicit determination as to the husband's credibility and her assessment of his testimony.

Finally, though it is not the subject of an objection by Plaintiff, the Court must address the issue of the hypothetical questions posed to the vocational expert. The magistrate rightly notes that such hypothetical questions must include all of the impairments that are adequately supported by the record. *See Chrupcala v. Heckler*, 829 F.3d 1269, 1276 (3d Cr. 1987) (citing *Podedworny v. Harris*, 745 F.2d 210 (3d Cir. 1984). If on remand for reassessment of several aspects of the record evidence the impairments found to be adequately supported change, whatever set of impairments is supported must be included in any hypothetical posed to a vocational expert.

Conclusion

With due respect to the magistrate's contrary recommendation, for the above reasons, the court remands this matter further proceedings consistent with this opinion.